

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*Jacob K. Javits Federal Building*
*26 Federal Plaza*
*New York, New York 10278*

August 22, 2025

**Via ECF**

Honorable Denise L. Cote
United States District Judge for the
Southern District of New York
500 Pearl Street
New York, NY 10007

    Re:    *United States v. Juan Carlos Serrate Middagh*, S17 19 Cr. 91 (DLC)

Dear Judge Cote:

    The Government respectfully submits this letter in advance of the August 29, 2025 sentencing in this matter, on the defendant's conviction of conspiring to import cocaine into the United States, in violation of Title 21, United States Code, Sections 952(a), 959(a), 960(a)(1), 960(a)(3), 960(b)(1)(B)(ii), and 963.

    As described below, Juan Carlos Serrate Middagh (the "defendant") and his co-conspirators agreed and planned to import ton quantities of cocaine into the United States from Bolivia. Between February 2020 and September 2020, the defendant and his co-conspirators participated in a series of recorded meetings and calls with Drug Enforcement Administration ("DEA") confidential sources (the "CSes" collectively and referred to individually below as "CS-1" and "CS-2"). During those meetings, the defendant and his co-conspirators discussed their plans to import multi-ton quantities of cocaine into the United States. For his part, the defendant introduced the CSes to his co-conspirators and was an active participant in numerous meetings to finalize the conspirators' massive cocaine trafficking plans, including meetings at which the financing of the cocaine deal was discussed and planned. Indeed, it was agreed that the defendant would receive the money to finance the deal by means of a wire from a bank account in New York to a bank account in Bolivia that the defendant was to provide. What is more, the defendant represented to CS-1 that he had contacts within the Bolivian government, including a high-ranking Bolivian government official with whom the defendant said he had spoken to ensure that the cocaine deal would receive the protection of corrupt members of the Bolivian government. While the defendant and his co-conspirators did not end up seeing their illicit plan come to fruition, such serious conduct nevertheless requires a significant sentence.

    Accordingly, and in light of the seriousness of the offense, the history and characteristics of the defendant, and the need to achieve deterrence, the Government respectfully requests that the Court impose a Guidelines sentence of 108 to 135 months' imprisonment.

## I. OFFENSE CONDUCT

### A. Background

In 2008, the Bolivian government expelled the DEA and the State Department following tensions relating to, among other things, U.S. anti-narcotics policies in the region. (*See* Final Presentence Investigation Report ("PSR") ¶ 16). Since that time, cocaine traffickers in Bolivia have acted with impunity, increasing cocaine production in-country and also acting as a transit point for cocaine manufactured in Peru, headed toward Brazil and then for international distribution. (*Id.*). In August 2019, the U.S. Government identified Bolivia as "a major drug transit or major illicit drug producing" country, along with others such as Colombia, Afghanistan, Venezuela, and Mexico. (*Id.*). In that memorandum, the U.S Government further singled out Bolivia and the illegitimate regime of Nicolás Maduro Moros in Venezuela as failing to adhere to their obligations under international counter-narcotics agreements. (*Id.*). On the same day, the U.S. State Department identified Bolivia as the third-largest producer of cocaine in the world, (*id.*), a position that Bolivia continued to maintain until as recently as at least 2024.[1]

In response to this pervasive cocaine production and trafficking, the DEA began targeting Bolivian drug traffickers in or around 2017. (PSR ¶ 17). By early 2020, the CSes, acting at the direction of the DEA, had established contact with several Bolivian drug traffickers and corrupt Bolivian government officials who facilitated their drug trafficking. One of those drug traffickers was the defendant, who, as described further below, introduced CS-1 to his co-conspirators and agreed to import ton-quantities of Bolivian cocaine to the United States alongside his co-conspirators. Over the course of several recorded meetings and phone calls, the defendant made clear to the CSes that he and his co-conspirators had the means and desire to ensure their plan would succeed, including by relying on protection for the deal that was to be provided by corrupt Bolivian government officials and producing significant quantities of cocaine for importation to the United States.[2]

### B. The Defendant Introduces CS-1 to his Co-Conspirators

On December 13, 2019, CS-1 met with the defendant, with whom CS-1 had a prior personal relationship, to discuss various topics relating to Bolivian politics. During the meeting, the discussion turned to the defendant's ability to contact individuals who would assist with providing access to airplane hangars in Bolivia at which drug traffickers could rely on official coverage from

---

[1] *See* U.S. Department of State, "U.S. Relations with Bolivia," (July 18, 2024), *available at* https://2021-2025.state.gov/u-s-relations-with-bolivia/.

[2] Unless otherwise noted, all meetings and phone calls between the CSes, the defendant, and the defendant's co-conspirators described herein were recorded and the descriptions of those meetings and calls are summaries, not verbatim descriptions. To the extent the Court would like draft summary translations of any of those meetings, or the recordings themselves (which are in Spanish) the Government will make those available.

corrupt Bolivian officials to fly cocaine out of Bolivia. During the meeting, the defendant also described the costs of providing coverage for those flights out of Bolivia.[3]

On January 31, 2020, CS-2—who was posing as CS-1's drug trafficking client—spoke on the phone with the defendant about CS-2's interest in working with the defendant and his associates to facilitate an anticipated cocaine deal by which cocaine would leave Bolivia by plane to the Dominican Republic and then be transported by boat to New York.[4] On the call, the defendant stated that drug trafficking was not his line of business, but that he had the appropriate contacts to arrange the deal and the transportation of the cocaine. The defendant discussed the importance of needing to advance their plans so that they could carry out future business and told CS-2 that the financial aspect of the deal was his area of expertise. The defendant told CS-2 that he needed to know whether CS-2 had the money available to do the deal and that the defendant had the means to move the money for the deal. CS-2 confirmed that the money was up by "the towers," (*i.e.*, New York), and would be made available to the defendant. On the call, CS-2 also asked the defendant to figure out the costs associated with the deal, which CS-2 explicitly described as involving transporting the cocaine by plane to the Dominican Republic, then by boat to New York.

On February 13, 2020, at CS-1's request, the defendant met CS-1 at a restaurant in Bolivia. (PSR ¶ 20). The purpose of the meeting was to discuss the potential cocaine deal, for which the defendant was planning to introduce one of his associates to CS-1. Shortly after CS-1 and the defendant arrived at the restaurant, the defendant's associate, Edwin Medina-Vaca ("Medina"), arrived at the restaurant and joined them. Following the defendant's introduction, CS-1 presented himself as representing Colombian clients who had partnered with a group in Mexico to send cocaine first to Punta Cana by air and then to New York through a maritime route. (*Id.*). As the meeting progressed and the parties discussed additional details about the anticipated cocaine transaction, CS-1 put Medina on the phone with CS-1's purported client, CS-2. (*Id.*). CS-2 and Medina discussed the logistics of transport and CS-2 said that he wanted to purchase between 1,300 and 1,500 kilograms of cocaine. (*Id.*). Following the call with CS-2, the defendant and Medina described to CS-1 their concerns about the DEA and the United States' aggressive prosecution of international traffickers. (*Id.*).

Despite these concerns, however, the defendant and Medina said that they trusted CS-1. (PSR ¶ 21). Accordingly, Medina called co-defendant Jorge Roca-Suarez ("Roca"), an infamous Bolivian cocaine trafficker, and told Roca it was clear for him to come to the meeting.[5]

---

[3] This meeting was not included in the PSR; however, the recording of the meeting was provided to the defense in connection with the Government's discovery productions.

[4] This call was also not included in the PSR; however, the recording of the call was provided to the defense in connection with the Government's discovery productions.

[5] In September 1993, Roca was convicted in the Eastern District of California on cocaine manufacturing, money laundering, and tax evasion charges. (PSR ¶ 18). Roca was sentenced to 425 months in prison for his leadership of a massive cocaine operation that supplied Colombian cocaine traffickers, including the Medellin Cartel, with tens of thousands of kilograms of cocaine. (*Id.*). In 2018, pursuant to an international prisoner transfer, Roca was sent to Bolivia to serve the

Shortly thereafter, Roca arrived with two security guards, who sat at a nearby table. (PSR ¶ 21). In the defendant's presence, Roca and CS-1 discussed the plan to send thousands of kilograms of cocaine to Punta Cana and then to New York. (*Id.*). During this conversation, CS-1 and Roca discussed the price of cocaine ($7,000 per kilogram to cover the cost of the cocaine and the safe transport out of Bolivia), the logistics of transport, and the quality of the cocaine, which Roca described as at least 97% pure. (*Id.*). Roca eventually left the meeting with Medina, and CS-1 and the defendant continued to discuss the logistics of payment for the cocaine deal, including the potential for a wire transfer from New York City to Bolivia. (*Id.*). The defendant further described for CS-1 that he was getting involved in the anticipated cocaine deal because of financial issues he had been encountering.[6]

### C. The Defendant and his Co-Conspirators Continue Meeting with CS-1 About the Cocaine Deal

Throughout February and early March 2020, CS-1 engaged in seven more recorded meetings with the defendant, Medina, and/or Roca in Bolivia. Throughout these meetings, CS-1 continued to describe the ultimate destination of the cocaine, and the source of funds, as being the United States. (PSR ¶ 22). For example, on February 15, 2020, CS-1 participated in a meeting with the defendant about the anticipated cocaine deal. (*Id.*). At the beginning of the meeting, the defendant told CS-1 that he had received some photographs from Medina that he wanted CS-1 to make copies of and proceeded to show CS-1 several photographs of cocaine. (*Id.*). Screenshots of the defendant showing the photographs of cocaine to CS-1, and of CS-1 taking photographs of the images on the defendant's phone, are below:

 

---

remainder of his sentence. (*Id.*). In December 2018, however, Roca was transferred from a Bolivian prison to a medical facility, from which he quickly escaped and began to reestablish his drug empire. (*Id.*).

[6] The defendant's description of financial issues is not reflected in the PSR but is reflected in the recording of the February 13, 2020 meeting described herein.

Immediately thereafter, the topic of conversation changed to how the anticipated cocaine deal would be financed. The defendant confirmed for CS-1 that he would be in charge of the financing (*i.e.*, the receipt of funds) for their anticipated cocaine deal. (*Id.*). The defendant then went on to state that he had recently spoken with the Bolivian Minister of Government and his advisor to confirm that he and his co-conspirators would receive the protection of Bolivian officials to carry out their cocaine deal. (*Id.*). During this meeting, the defendant also warned CS-1 to not tell others about their involvement in the cocaine transaction. (*Id.*). At this meeting, the defendant also provided CS-1 with instructions on wiring him approximately $20,000 to a particular bank account to begin facilitating the cocaine transaction, the account details of which were to be provided at a later date. (*Id.*).

A few days later, on February 19, 2020, the defendant once again met with CS-1. (PSR ¶ 23). During this meeting, the defendant and CS-1 discussed a potential 5-kilogram cocaine sample in anticipated of their larger cocaine deal. (*Id.*). They then went on to discuss the price of the product and the defendant told CS-1 that he would provide CS-1 with a bank account into which the money for the cocaine transaction was to be deposited. (*Id.*). The defendant further told CS-1 that he planned to take an 18% fee of the money deposited into the account and that the percentage that the defendant would take from facilitating the deal's financing was non-negotiable. (*Id.*).

The following day, on February 20, 2020, CS-1 met with the defendant and Roca at a restaurant in Bolivia. (PSR ¶ 22). During the meeting, CS-1, Roca, and the defendant discussed, in detail, the protection that they would receive from Bolivian government officials for the cocaine deal, the airports that they could potentially use to fly cocaine out of Bolivia, the purity of the cocaine, and the financing for the deal. (*Id.*).

### D. Roca Shows CS-1 the Cocaine that his Organization Could Produce

The meetings between CS-1, Roca, and Serrate continued through early 2020. (PSR ¶ 24). During those meetings, some of which only included Roca and CS-1, Roca described for CS-1 how he was rebuilding his operations following his incarceration in the United States, including by reclaiming laboratories and clandestine runways—some of which he showed CS-1 in photographs—and by working with the leader of the Sinaloa Cartel. (*Id.*).

During one of these recorded meetings, on February 23, 2020, Roca brought CS-1 to a ranch run by an individual identified as "Richard" to test some of Roca's cocaine supply. (PSR ¶ 25). Roca advised Richard that he needed a load of 1,350 kilograms of cocaine that would be transported by plane for a customer other than CS-1. (*Id.*). Richard brought out the load of cocaine—so large that it was transported in the bed of a pickup truck—and Roca permitted CS-1 to inspect one of the kilograms, indicating that CS-1 could choose any of the kilograms of cocaine in the truck CS-1 chose to prove all of the cocaine was genuine. (*Id.*). Screenshots of the cocaine being shown to CS-1 are below:





On multiple occasions thereafter, including during a meeting on March 3, 2020, CS-1 requested a five-kilogram sample of cocaine to be provided in Brazil, but Roca and the defendant did not agree, explaining that CS-1 has already seen and inspected the product and there is no need for a small five-kilogram transaction when they are ready to do the full deal. (PSR ¶ 26). The defendant also further refused to provide CS-1 with any account details of the bank accounts to be used for the transaction until the deal was finalized. (*Id.*).

## II. PROCEDURAL HISTORY

On September 22, 2020, the defendant, Roca, and Medina were charged in the above-captioned case. Each defendant was charged with conspiring to import five kilograms and more of cocaine into the United States, from at least in or about February 2020 through in or about September 2020, in violation of Title 21, United States Code, Sections 952(a), 959(a), 960(a)(1), 960(a)(3), 960(b)(1)(B)(ii), and 963.

On November 7, 2023, the defendant was arrested in Panama pursuant to a provisional arrest warrant based on the charge in the Indictment. (PSR ¶ 35). The defendant was extradited to the United States on October 7, 2024, and made his initial appearance in this District on October 8, 2024.

On May 29, 2025, following a safety valve proffer, the defendant pled guilty to Count One of the Indictment, pursuant to a plea agreement (the "Plea Agreement"). In the Plea Agreement, the defendant stipulated that the offense conduct involved more than 450 kilograms of cocaine—the highest level available under the Guidelines—and as such, the base offense level is 38. Because of the defendant's timely acceptance of responsibility, a three-level decrease was warranted. In addition, because the defendant appears to meet the criteria for safety valve eligibility, *see* U.S.S.G. § 5C1.2, a two-level decrease is warranted. And because the defendant also meets the criteria for being a Zero-Point Offender, *see* U.S.S.G. § 3E1.1(b), an additional two-level decrease is warrant. The defendant's offense level under the Plea Agreement is thus 31. Given the defendant's lack of any known criminal convictions, the defendant is in Criminal History Category I. Accordingly, the Plea Agreement stipulated to a Guidelines range of 108 to 135months' imprisonment (the "Stipulated Guidelines Range"), with no mandatory minimum term of imprisonment, assuming the Court finds that the defendant is eligible for safety valve relief.

The Probation Office calculated the same Guidelines range as the Stipulated Guidelines Range in the Plea Agreement and recommends a within-Guidelines sentence of 108 months' imprisonment, citing, among other things, the "toxic effects and addiction risk" of cocaine that is also "fueling the epidemic of drug abuse." (PSR at 24).

## III. DISCUSSION

The Government respectfully submits that a sentence within the Stipulated Guidelines Range of 108 to 135 months' imprisonment would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing in this case. In particular, the seriousness of the offense, the history and characteristics of the defendant, the need to promote respect for the law, and the importance of achieving deterrence all support the imposition of such a sentence in this case.

### A. The Nature and Seriousness of the Offense

The nature and circumstances of the defendant's offense merit a significant sentence. *See* 18 U.S.C. § 3553(a)(1). The defendant conspired to import massive quantities of cocaine into this country. The defendant and his co-conspirators planned to import more than a ton of cocaine from

Bolivia into the United States—enough to flood this community with a dangerous controlled substance for years and place him comfortably, and undisputedly, within the highest bracket of the Guidelines Drug Quantity Table. As courts in this District have previously recognized, "[c]ocaine is a dangerous drug, which destabilizes communities when it gets down to the retail level. At the wholesale level, [as present here], it destabilizes nations[.]" *United States v. Gomez*, 18 Cr. 262 (VEC), Dkt. 170 at 26 (Jan. 27, 2023). Indeed, "the harm that is done by a ton of cocaine is almost incalculable. The lives affected, the families affected, the communities affected by drugs of that type and that volume is staggering." *United States v. Palagio Suarez*, 16 Cr. 453 (RJS), Dkt. No. 160, at 27; *see also United States v. Santibanez*, No. 13 Cr. 912 (RJS), 2020 WL 3642166, at *3 (S.D.N.Y. July 6, 2020) ("[T]he drugs at issue here cripple individuals and destroy families and whole communities."). Moreover, the defendant endeavored to participate "in an important way in the distribution of a substance, which creates misery in the lives of the people who use it," and he "was indifferent to the poison that was being distributed and ruining people's lives." *United States v. Aguirre Cuero*, 15 Cr. 125 (PKC) (Dkt. No. 36, Tr. 22, 24). And this sort of cocaine trafficking harms not just the United States, but every country the drugs transit:

> It is clear that this type of activity has an impact on Colombia, on Mexico, and other countries, the safety of people in those countries, in the strength of their institutions, including their judicial institutions, including their police and prosecutorial forces. This drug activity contributes to all of that. It is organized crime. When people decide to assist organized crime enterprises, they have to understand the consequences that are caused by that in multiple countries. It is a serious crime.

*United States v. Cabezas Garcia*, 17 Cr. 23 (RJS) (Dkt. No. 71, Tr. 21). The staggering drug quantity involved in this case, and the international scope of the defendant's conduct, alone support the imposition of a Guidelines sentence.

      The defendant's willingness and ability to traffic in such significant quantities of cocaine merits serious consideration from the Court. The defendant was an integral member of the conspiracy, participating in numerous meetings that took place and seeking to ensure that the conspiracy's goal—to import tons of cocaine to the United States—would be successful. The defendant did that in numerous ways, including, as described above, by (i) introducing the CSes to his co-conspirators; (ii) participating in meetings to discuss the quality, pricing, and amount of ton-quantities of cocaine destined for the United States; (iii) showing CS-1 photographs of the cocaine to which the defendant and his co-conspirators had access; and (iv) importantly, agreeing to receive the money that would be used to finance the cocaine deal. Moreover, as described above, during meetings with the CSes and his co-conspirators, the defendant demonstrated his knowledge of the international drug trade, participating in detailed discussions about cocaine loads. To make matters worse, the defendant discussed his access to and relationships with corrupt Bolivian government officials who would provide protection of the anticipated cocaine deal.

      The drug trafficking plans of the members of this conspiracy were not merely aspirational. As described above, Roca—an infamous Bolivian drug trafficker in his own right—showed CS-1 a truckload of cocaine that he and his co-conspirators, including the defendant, could access. The ability to test and produce kilogram-quantity samples of the cocaine further underscores the level of sophistication, experience, and access that members of this conspiracy had in the drug

trafficking world. In addition, the fact that the defendant was trusted to participate in all these meetings and personally serve as the individual who would receive the money to finance the deal further underscores that he was an integral member of this massive cocaine importation conspiracy. The seriousness of that conduct should not be minimized.

Accordingly, the nature and seriousness of the defendant's conduct strongly supports a Guidelines sentence.

### B. The History and Characteristics of the Defendant

The history and characteristics of the defendant also call for a substantial sentence. *See* 18 U.S.C. §§ 3553(a)(1). The Government acknowledges that the defendant's lack of prior criminal convictions in the United States helped make him eligible for Safety Valve relief, and also led to other reductions in the offense level attributable for this conduct. Those Guidelines reductions have already provided the defendant significant consideration for his lack of criminal history, though the Government notes that this is less relevant for the defendant who was arrested for his role as an overseas participant in international cocaine trade. Though the defendant insists in his sentencing submission that his participation in this conspiracy was aberrant, his conduct— repeatedly audio- and video-recorded—belies this fact. In the earliest meetings regarding the plot, the defendant indicated his connections to well-established, senior members of the Bolivian government would ensure the success of the venture.

The defendant also promised to handle large-scale financial transactions to launder the money connected to the crime, and to do so internationally, through both Bolivian and United States money movements. The defendant's facility with this aspect of the international drug trade and promises to facilitate the scheme through official connections demonstrate his obvious familiarity with this type of criminal conduct. Even later in the scheme, the defendant amply confirmed his ability to engage in such conduct by, together with a co-conspirator, introducing Roca—one of the most prolific cocaine traffickers in history—to the CSes and cementing his ability to be part of the negotiations for a ton-quantity cocaine deal. The defendant also withheld financial transaction information until he could be certain the CSes would fulfill their portion of the conspiracy, undermining a key mitigator cited by the defendant, and showing his sophistication and care to safeguard any evidence that could trace back to the money he has made from narcotics trafficking. Thus, despite a lack of any known prior criminal convictions, the defendant's conduct, and his demonstrated facility with large-scale narcotics trafficking, merits a Guidelines sentence.

### C. The Need to Achieve Deterrence and Promote Respect for the Law

The need to afford adequate deterrence to the defendant and others similarly situated, and to promote respect for the law, also speaks loudly to the need for a serious sentence in this case. *See* 18 U.S.C. §§ 3553(a)(2)(A)-(B).

With respect to specific deterrence, although the defendant had every opportunity and advantage to lead a law-abiding life, when presented with the chance to participate in an international drug trafficking scheme to import ton-quantities of cocaine, the defendant jumped at the opportunity to introduce the CSes to his drug trafficking partners and participate in meeting

after meeting to ensure the conspiracy's objectives would be achieved. The defendant demonstrated, through his words and his actions, that he had powerful associates in the drug trafficking world who could access kilogram quantities of cocaine to supply the anticipated deal.

Moreover, the defendant is 59 years old and in relatively good health. After the defendant completes any sentence imposed by the Court, he will be removed to Bolivia, where he could once again turn to the type of criminal conduct that resulted in the instant case and, with the lessons he has learned in connection with this prosecution, possibly become a less detectable drug trafficker. As such, the need to deter the defendant from committing similar crimes in the future once he is back in Bolivia should carry heavy weight in determining the defendant's sentence.

Just as important is the need for the sentence to afford general deterrence and to promote respect for the law. The sentence imposed should demonstrate that cocaine trafficking will not be tolerated, and that traffickers, like the defendant, who seek to import significant amounts of cocaine to the United States, will face significant consequences. As such, the need to deter the defendant and others who would consider the same path, and to promote respect for the law, should also weigh heavily in the imposition of the defendant's sentence.

### D.  A Guidelines Sentence Would Not Result in Unwarranted Sentencing Disparities

A Guidelines sentence would be precisely in line with other sentences related to other offenders sentenced in this case. First, and only with respect to defendants previously sentenced in this case, the Government submits that the defendant's conduct, though distinct, is most similar to that of Percy Vasquez-Drew. Vasquez-Drew, like the defendant, received safety valve relief (U.S.S.G. § 4C ("Zero-Point Offenders") was not in effect at that time) and was ultimately sentenced by this Court to a 120-month term of imprisonment.[7] Like the defendant, Vasquez-Drew promised to secure the cocaine transaction in part through his official government contacts, and moved the conspiracy forward by introduction the confidential sources to other participants to fulfill various parts of the conspiracy. As the Court well knows from the prior sentencings in this case, the defendant's efforts to compare himself to Roberto Banzer and Carlos Robledo-Anez are wholly unavailing. Each of those two defendants occupied a far lower position in the offense conduct, where the instant defendant was at the inception and every important part of the deal.

### E.  The Defendant's Remaining Arguments are Unpersuasive

By his sentencing submission, the defendant rattles off seriatim reasons that his conduct should be viewed as making him "far less culpable" than anyone else in the case.[8] The defendant

---

[7] For reasons wholly unrelated to the nature of Vasquez-Drew's offense, the judgment was later amended by the Honorable Mary Kay Vyskocil to 100 months' imprisonment. (Dkt. No. 345).

[8] The defendant claims to have withdrawn from the conspiracy, but there is no evidence to support that claim. The defendant relies on the fact that the defendant did not respond to WhatsApp messages from a CS in March of 2021, but those messages were approximately one week after Roca had been arrested—a fact that was the subject of significant international reporting. The CS was contacting the defendant to try to convince the defendant to surrender to law enforcement, and

insists he was never before involved in narcotics trafficking, and was motivated by a desperation for money. But when offered the opportunity for cash infusions, the defendant refused to share financial information because he was too worried he would be caught—he waited instead for confirmation that the drug deal was happening, to protect himself. Similarly, his protestations of naivete and non-involvement cannot withstand scrutiny. The defendant did not magically know how to respond with specific logistics, financial calculations, and details of the cocaine trade when he was approached by the first CS to land a ton-quantity cocaine deal. And it is just as unbelievable to think that within a meeting or two of starting a cocaine discussion with the CS that the defendant was coincidentally sitting at the table with one of the most notorious Bolivian cocaine traffickers of all time, Roca. Indeed, Roca would never find himself negotiating ton-quantity transactions with people he knew could not be trusted to participate in the international cocaine trade. Neither would the co-conspirators. Put simply, this is not an entry-level crime.

And the defendant did not behave like an entry-level criminal. Indeed, what is so troubling about this conduct apart from the overwhelming scope of the planned cocaine transactions is the willingness of this defendant, like Vasquez-Drew and others, to leverage official corruption— elements of the Bolivian government violating international law to enrich themselves—to secure drug deals. This cynical exploitation of governmental authority destroys civil society, helps drug cartels and manufacturers, and harms every other country in the world that is trying to protect their citizenry from the violence, degradation, and death that drugs bring. Meanwhile, the defendant told Probation that he used to have an occasional rum-and-coke, but he quit drinking years ago "because he's an athlete." (PSR ¶ 83). And, of course, the defendant also disclaimed using any drugs. (PSR ¶ 82). The defendant took care of himself but showed no compunction whatsoever about a plan to send more than a ton of cocaine to the United States, where he knew very well countless victims would use it to poison themselves, destroy their connections to friends and family, and experience financial ruin. He willingly engaged in that conduct while offering to exploit his ties to corrupt government officials, all so he could make money. His conduct is serious and warrants a significant sentence.

---

the defendant made no effort whatsoever to contact law enforcement. Instead, he severed contact with the CS and hoped he would not also be arrested.

## CONCLUSION

For the reasons set forth above, the Government respectfully submits that a Guidelines sentence of 108 to 135 months' imprisonment would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing in this case.

Respectfully submitted,

JAY CLAYTON
United States Attorney

By: /s/ _____
Sam Adelsberg
Matthew J.C. Hellman
David J. Robles
Chelsea L. Scism
Assistant United States Attorneys
(212) 637-2550

cc:   Defense Counsel (by ECF)